UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


RICKY L. FIELDS,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )   Case No. 2:11CV35 FRB
                                    )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,                 )
                                    )
            Defendant.              )


**MEMORANDUM AND ORDER**

        This matter is before the Court on plaintiff Ricky L.
Fields's appeal of an adverse decision of the Social Security
Administration.   All matters are pending before the undersigned
United States Magistrate Judge, with consent of the parties,
pursuant to 28 U.S.C. § 636(c).

        On September 19, 2007, plaintiff filed an application for
Disability Insurance Benefits (also "DIB") pursuant to Title II,
and/or for Supplemental Security Income (also "SSI") pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 401, et seq.
(also "Act").   (Administrative Transcript ("Tr.") 16, 78, 84).   In
his applications, plaintiff alleged disability beginning on
February 1, 2007.   (Id.)   Plaintiff's applications were initially
denied, and he requested a hearing before an Administrative Law
Judge (also "ALJ"), which was held on September 16, 2008.   (Tr. 27-
43).   On January 27, 2009, the ALJ issued his decision denying
plaintiff's claims.   (Tr. 13-26).

-1-

Plaintiff subsequently filed a Request For Review of Hearing Decision/Order with defendant agency's Appeals Council, seeking review of the ALJ's decision.  On March 14, 2011, the Appeals Council denied plaintiff's request to review the ALJ's decision.  (Tr. 1-3).  The ALJ's decision thus stands as the Commissioner's final decision subject to review by this Court.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

During the administrative hearing, plaintiff, age 49, testified that he was right-handed, single, and lived alone.  (Tr. 32-35).  He testified that he was five feet six inches tall, and weighed 160 pounds.  (Tr. 34).  When plaintiff was asked whether 160 pounds was within the normal range for him, plaintiff stated: "Yeah.  I'm gaining weight now.  Ever since I got to feeling a little bit better I kind of gained a little, few pounds."  (<u>Id.</u>)

Plaintiff testified that he had completed high school, during which he was enrolled in regular education classes, and was able to read, write and perform arithmetic.  (Tr. 33).  In 2006, plaintiff suffered a crush injury to the small finger of his left hand that necessitated amputation of the digit.  (<u>Id.</u>)

Plaintiff testified that he had suffered a blood clot in his left arm, which had caused his arm to become numb and cold.  (Tr. 35).  He underwent surgery to remove the clot.  (<u>Id.</u>)  Plaintiff also suffered a blood clot in his left leg, which was also treated surgically.  (Tr. 36).  In February of 2008, plaintiff

-2-

underwent cardiac bypass surgery, and at the time of the hearing was receiving continued follow-up care.  (Tr. 35-36).

When plaintiff was asked where he currently had regular pain, plaintiff testified that he had constant pain in his left foot which he described as a burning sensation like an electric shock, and which was worsened by standing, walking, or sitting too long.  (Tr. 37).  Plaintiff testified that, other than his foot, he had no other pain in his left leg.  (Tr. 38).

Regarding his right leg, plaintiff testified that, when he walked any distance, "it gets like a cramp in the calf, walk or stand too long."  (Id.)  Plaintiff testified that he did not have any problems with his left arm.  (Id.)  He testified that he does not have any chest pain or shortness of breath.  (Id.)  Plaintiff testified that, on a good day, he spent nine hours sitting in a recliner to alleviate his lower extremity symptoms.  (Tr. 38).  He testified that, on a bad day, he spent most of the day in the recliner.  (Id.)

Plaintiff testified that pain in his left leg woke him from sleep, and that it was uncomfortable for him to drive farther than 18 miles due to pain in his left foot which he rated as a five on a one-to-ten scale.  (Tr. 38-39, 41-42).  He testified that this pain level was what he experienced when taking his medication, and that without medication, his pain would be a ten on a one-to-ten scale.  (Tr. 42).  He testified that he could walk for approximately one block, and could stand in one place and sit for ten minutes before experiencing pain in his leg.  (Tr. 39).

-3-

Plaintiff testified that he could lift ten pounds but not 25 because it was "just too uncomfortable." (Id.)

Plaintiff described having problems with alcohol in the past, and testified that he still drank six beers per week. (Tr. 40). He testified that he used to smoke three packs of cigarettes per day, but now smoked less than one pack per day. (Id.) He testified that he was unable to afford smoking cessation medications. (Id.)

B.   Medical Records

Records from University Hospital & Clinics, University of Missouri Health Care ("University Hospital") indicate that plaintiff presented to the Emergency Room on March 19, 2006 after sustaining a crush injury to his left small finger while working with livestock. (Tr. 245-48). Plaintiff's left small finger was amputated in the Emergency Room. (Tr. 249-50). Plaintiff had continued complaints referable to the amputation stump, and subsequently underwent an amputation revision to improve his functionality. (Tr. 233). On July 26, 2006, plaintiff was released to return to work with no restrictions. (Id.)

On April 9, 2007, plaintiff presented to the Emergency Room with complaints of left foot pain and numbness. (Tr. 190, 196-97). He was diagnosed with acute ischemia of the left leg, was hospitalized, and underwent a thromboembolectomy (surgical removal of a blood clot). (Tr. 186-87, 190-91, 213-15). While in the hospital, plaintiff's clinical course was complicated by symptoms attributed to alcohol withdrawal. (Tr. 202-11). On April 11,

-4-

2007, it was noted that plaintiff was not well oriented to place and had only a vague understanding of his present illness. (Tr. 202). Plaintiff reported drinking six beers per day, and using marijuana. (Tr. 203). He reported working at a gas station and grocery store. (Id.) Upon examination, plaintiff was noted to be restless, and to have tremors and slurred speech. (Tr. 205). On April 12, 2007, it was noted that plaintiff was more agitated, and that he "wanted to be untied and go home." (Tr. 207). It was noted that plaintiff was aggressive and used profanity, exhibited tremors, and was not oriented to time or place. (Id.) It was noted that this was plaintiff's third day without beer. (Tr. 210). On April 16, 2007, plaintiff's condition was improved, he stated that he felt that alcohol may have contributed to his leg condition and acknowledged he should stop, but denied that he needed rehabilitation to do so. (Tr. 211). An April 26, 2007 Arterial Doppler study revealed normal findings in plaintiff's legs. (Tr. 297).

On May 8, 2007, plaintiff presented to University Hospital and reported having passed black stools. (Tr. 186-87). It was noted that he was taking iron tablets, Percocet,[1] Colace,[2] and aspirin, and that he smoked two packs of cigarettes per day. (Tr. 187). Examination was normal, and plaintiff was scheduled for

---

[1]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601007.html

[2]Colace is a stool softener used on a temporary basis to relieve constipation.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601113.html

-5-

hemocult and sigmoidoscopy testing.  (Id.)

On June 14, 2007, plaintiff presented to Samaritan Memorial Hospital with complaints of pain in his left arm.  (Tr. 256-60).  Plaintiff was diagnosed with a possible arterial occlusion of the left upper extremity, and was transferred to University Hospital.  (Tr. 267, 260, 265, 301).  At University Hospital, examination revealed a left arm arterial occlusion, (Tr. 312), and plaintiff was admitted.  (Tr. 315).  It was noted that plaintiff smoked one to three packs of cigarettes per day and drank six beers per day, and worked in "Recycling metals."  (Tr. 331).  An echocardiogram revealed a medium-sized, irregular, mobile "vegetation," or abnormal growth, on the left ventricular aspect of the aortic valve.  (Tr. 318, 335).  Venous Doppler testing of plaintiff's lower extremities revealed moderate right lower extremity arterial occlusive disease, worse than the results of the Venous Doppler testing that was performed on April 26, 2007.  (Tr. 562).  The findings relative to plaintiff's left lower extremity were within normal limits.  (Id.)  Plaintiff underwent vascular surgery during which a thrombus was removed, and he was discharged on June 22, 2007.  (Tr. 337-38).

On July 21, 2007, plaintiff was seen in follow up by Carl Freter, M.D. at University of Missouri Health Care.  (Tr. 367-70).  Plaintiff complained of an aching pain in his left lower extremity which had been stable, but reported that he was feeling better overall.  (Tr. 368).  Plaintiff reported that he worked hauling trash, and stated that he smoked one and one-half packs of

cigarettes per day and drank six beers per day.  (Tr. 369).  Dr. Freter told plaintiff to stop smoking, but plaintiff reported that he was not interested in quitting.  (Tr. 370).  Plaintiff was given anticoagulant medication.  (Id.)

On July 25, 2007, plaintiff presented to Samaritan Hospital with complaints of multiple abrasions and contusions to his face, secondary to an altercation or an accident in an unspecified place.  (Tr. 269).  Plaintiff was intoxicated, but alert and oriented.  (Tr. 270-72).  In a section titled "Other History," it was noted that plaintiff was incarcerated.  (Tr. 270). He reported that he was self-employed.  (Tr. 269).  He reported no musculoskeletal or neurologic complaints.  (Tr. 270).  CT scan revealed a broken nose.  (Tr. 275).  He was treated and released into the custody of law enforcement in ambulatory condition.  (Tr. 273).

On August 16, 2007, plaintiff was seen in the Cardiology Outpatient Clinic of University of Missouri Health Care by Kul B. Aggarwal, M.D., who diagnosed plaintiff with aortic valve disorder with mild regurgitation and mass.  (Tr. 301-03).  Plaintiff complained of leg pain for which he was taking up to four Percocet tablets per day.  (Tr. 372).  He was also taking an anti-coagulant. (Id.)  Dr. Aggarwal recommended that plaintiff follow up in two months for a repeat echocardiogram.  (Tr. 303).

On September 17, 2007, plaintiff saw W. Kirt Nichols, M.D., at University of Missouri Health Care for follow-up.  (Tr. 374-77).  Plaintiff reported stable left lower extremity pain and

only minimal swelling.  (Tr. 375).  Plaintiff denied shortness of breath or chest pain, and reported that he continued to smoke at least one pack of cigarettes per day.  (Id.)  He was advised to stop smoking in order to decrease his risk of future thromboembolic events.  (Tr. 376).

On October 9, 2007, Ruth Stoecker, M.D., completed a Case Analysis.  (Tr. 380).  Dr. Stoecker noted that there was no documented limitation to plaintiff's functioning.  (Id.)  Dr. Stoecker noted plaintiff's diagnoses, his clinical course and surgical intervention, and noted that he denied musculoskeletal or neurologic deficit until August 16, 2007.  (Id.)  Dr. Stoecker noted that plaintiff continued to smoke despite medical advice to stop, and also noted that plaintiff was fully ambulatory on July 25, 2007 when he was injured in an altercation and was discharged into law enforcement custody.  (Id.)  Dr. Stoecker noted that plaintiff had "no edema, no unhealed lesions, no claudication or obstructing thrombus, no motor or sensory deficit."  (Tr. 380).[3] Dr. Stoecker noted that plaintiff had normal pedal pulses, and no residual deficit from his two isolated thromboembolic events. (Id.)

On October 17, 2007, plaintiff was seen at University Hospital with complaints of worsening numbness in his left foot

_____

[3] The term "claudication" refers to a condition caused by inadequate blood supply to the muscles and characterized by attacks of lameness and pain, mainly in the calf muscles. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000), available at STEDMAN'S 81880 (Westlaw).

over the past three days. (Tr. 421). He reported using alcohol and tobacco regularly. (Tr. 422). He was diagnosed with sensory changes to his left foot, and advised to follow up at the vascular surgery clinic. (Tr. 423). On October 30, 2007, it was noted that plaintiff's foot pain was significantly improved with Neurontin.[4] (Tr. 416). Arterial Doppler study performed on November 29, 2007 revealed findings consistent with moderate arterial occlusive disease on the right, and normal values on the left. (Tr. 554).

On January 3, 2008, plaintiff was seen at University Hospital for follow-up. (Tr. 645-46). He reported that he continued to have some lower extremity shooting pains which were somewhat relieved by Neurontin. (Tr. 646). He reported no problems with his Lovenox injections, but stated that he felt "tired of them." (Id.) He denied other complaints, and examination and lab testing yielded normal results. (Id.) On January 10, 2008, plaintiff saw Dr. Aggarwal at University Hospital for follow-up, and reported no complaints. (Tr. 406). Echocardiogram revealed a continued abnormality on plaintiff's aortic valve. (Id.) Dr. Aggarwal noted that "the aortic valve still remains an unresolved issue and if it is persistent, then perhaps we should consider surgical correction" due to the risk of embolization, and recommended that plaintiff undergo a

_____

[4]Neurontin, or Gabapentin, is an anticonvulsant that is used to treat various conditions, including relieving the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles) and restless leg syndrome.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

transesophageal echocardiogram.  (Tr. 407).

On January 24, 2008, plaintiff returned to Dr. Aggarwal who reviewed the results from plaintiff's transesophageal echocardiogram and noted that it revealed a small mass attached to the aortic valve, and moderate aortic regurgitation.  (Tr. 618-19). Dr. Aggarwal opined that plaintiff's condition was slowly worsening, and that plaintiff should undergo surgical aortic valve replacement.  (Id.) Dr. Aggarwal noted that plaintiff's leg pain was unlikely to be related to plaintiff's valvular heart disease, and was unlikely to change following surgery.  (Tr. 620).  On January 25, 2008, plaintiff was seen in consultation by Richard Schmaltz, M.D., of University Hospital for evaluation for surgical intervention with coronary artery bypass graft surgery and subsequent aortic valve replacement.  (Tr. 392).  Plaintiff reported that he had retired from work due to his health problems. (Tr. 393).  Plaintiff reported daily consumption of one pack of cigarettes and six beers.  (Id.)  Plaintiff complained of some numbness and burning of his left foot.  (Tr. 394).  Dr. Schmaltz noted that the mass on plaintiff's aortic valve was most likely the source of plaintiff's thromboembolic disease.  (Tr. 395).  Dr. Schmaltz opined that plaintiff was a candidate to undergo coronary artery bypass graft surgery as well as an aortic valve replacement with a mechanical valve.  (Id.)  Plaintiff was hospitalized on February 14, 2008, and on February 18, 2008, Dr. Schmaltz performed aortic valve replacement.  (Tr. 385-86).  Plaintiff was discharged the following day.  (Tr. 382).  He was instructed to walk and climb

stairs as tolerated, and to lift only ten pounds during weeks one through four, and lift only 25 pounds during weeks five through 12. (Id.)

On March 6, 2008, plaintiff was seen by Elizabeth U. Ucheoma, M.D. at University Hospital for a two-week follow-up visit. (Tr. 633).  It was noted that plaintiff was in very good spirits, and that he had enjoyed a very normal and well postoperative course.  (Id.)  Plaintiff reported very minimal sternal or right thigh pain, and was no longer taking Percocet but was taking Vicodin.[5]  (Id.)  Plaintiff reported no chest pain or shortness of breath, but did report right lower extremity weakness that had been present since before the surgery and that made it difficult to walk.  (Tr. 634).  Plaintiff had 2+ peripheral pulses in all extremities.  (Id.)  Plaintiff was given a work release form to excuse him from work "for about four weeks."  (Tr. 635).

On April 18, 2008 and May 9, 2008, plaintiff presented to John F. Best, M.D., for follow-up.  (Tr. 627, 629).  Plaintiff complained of pain in his legs on walking, and weakness.  (Id.)  During the April 18 visit, Dr. Best noted that plaintiff had made an excellent recovery post aortic valve replacement, but that he was concerned about plaintiff's history of claudication, and ordered a peripheral Doppler study.  (Tr. 628-37).

On May 17, 2008, plaintiff presented to Samaritan Hospital with complaints of right leg and lumbar pain, and

---

[5]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

-11-

tenderness and spasm was noted in the right L5 area.  (Tr. 603-04).

On June 5, 2008, plaintiff was evaluated by Jason Wolf, M.D., at University Hospital for complaints of left leg pain.  (Tr. 624).  Plaintiff reported that he was taking Neurontin and that his pain had improved to some extent.  (Tr. 625).  Plaintiff reported that he had reduced his smoking to three packs per week.  (Id.) Plaintiff confirmed that he understood that it was important to stop smoking to improve his vascular condition.  (Id.)  Dr. Wolf recommended that plaintiff walk for exercise for 30 minutes per day, and cease smoking entirely.  (Id.)

On June 13, 2008, plaintiff returned to Dr. Best with continued complaints of symptoms in both lower extremities.  (Tr. 643).  Dr. Best reviewed plaintiff's Doppler study, and ordered further testing to evaluate the severity of plaintiff's peripheral vascular disease.  (Tr. 644).  On July 1, 2008, Dr. Best performed cardiac catheterization and an artogram which revealed no evidence of significant supra popliteal disease, and mild infrapatellar disease.  (Tr. 661-62).  Dr. Best recommended aggressive medical management and smoking cessation.  (Tr. 662).

On August 19, 2008, plaintiff saw James McDowell, M.D. and reported that he felt good but had discomfort in his right calf and left foot.  (Tr. 665).  Dr. McDowell noted that plaintiff's intermittent claudication had persisted for several years and appeared to be stable at present, but should be monitored.  (Id.) Plaintiff reported smoking one pack of cigarettes per day and drinking alcohol, but that he was trying to quit.  (Id.)  Plaintiff

had no swelling of his lower extremities, but his peripheral pulses were noted to be diminished.  (Id.)  On September 12, 2008, plaintiff returned to Dr. McDowell with complaints of left foot pain that felt like a burn and electrical shock.  (Tr. 663). Plaintiff reported drinking alcohol and smoking one pack of cigarettes per day, but stated that he was trying to quit.  (Id.) Dr. McDowell diagnosed plaintiff with neuropathy and prescribed medication, and advised plaintiff to follow up in one month.  (Tr. 663-64).

    C.    Other Evidence

         In a Function Report completed on October 1, 2007, plaintiff indicated that he lived alone in a house, and that his daily activities included getting up and taking medication, preparing coffee and breakfast, performing needed housework such as dishes, laundry and the like, preparing an evening meal, and retiring for bed at 9:00 or 10:00 p.m.  (Tr. 144).  Plaintiff wrote that, due to the pain in his legs from surgery, he could not stand or walk for any length of time.  (Tr. 145).  He stated that pain woke him from sleep.  (Id.)  Plaintiff wrote that he went outdoors often, drove a car, and was able to go out alone.  (Tr. 147).  He wrote that he was able to shop for food and household supplies once per week for one hour.  (Id.)  Plaintiff wrote that he spent four to six hours per day engaging in his hobbies of reading and watching television.  (Tr. 148).  Plaintiff wrote that he often visited with others, and that people visited him often and some people came by every day.  (Id.)  He wrote that he regularly went

-13-

to the store and regularly went to visit with friends and family. (Id.) Plaintiff wrote that he was unable to stand for very long or carry more than a little weight, and that he could walk only one-half block and could sit for only 15 to 20 minutes.  (Tr. 149).

### III.   The ALJ's Decision

The ALJ in this case determined that plaintiff had the severe impairments of coronary artery disease, neuropathy not otherwise specified, and left small finger amputation. (Docket No. 18).  The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Id.)  The ALJ determined that plaintiff had the residual functional capacity (also "RFC") to perform the full range of sedentary work.[6]  (Tr. 19).  The ALJ determined that plaintiff was unable to perform his past relevant work, but considering his age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  (Tr. 25).  The ALJ determined that plaintiff was not under a disability, as defined in the Social Security Act, from February 1, 2007 through the date of the decision.  (Tr. 26).

---

[6]The Regulations define sedentary work as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

## IV.    Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits

-15-

his ability to do basic work activities.   If the claimant's impairment(s) is not severe, then he is not disabled.   The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.   If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled.   At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.   If so, the claimant is not disabled.   Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.   Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).   The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).   If substantial evidence exists to support the

-16-

administrative decision, this Court must affirm that decision even if the record also supports an opposite decision. Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. In support, plaintiff argues that the ALJ failed to properly evaluate the credibility of his subjective complaints, and erroneously considered plaintiff's failure to stop smoking despite medical advice to do so. Plaintiff also challenges the ALJ's RFC determination, arguing that it is unsupported by medical evidence, and the ALJ failed to ensure a fully and fairly developed record. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

A.  Credibility Determination

The ALJ in this case determined that plaintiff's allegations of an inability to lift and carry up to ten pounds and sit for most of an eight-hour workday were not consistent with the evidence as a whole, persuasive, or credible. Plaintiff challenges the ALJ's adverse credibility determination, arguing that the ALJ erroneously considered plaintiff's failure to stop smoking, and

erroneously considered the lack of a medical opinion that plaintiff had work-related limitations of function.

Before determining a claimant's residual functional capacity, the ALJ must evaluate the credibility of his subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In assessing plaintiff's credibility, the ALJ in this case wrote that he had considered all of plaintiff's symptoms and the extent to which they were consistent with the objective medical evidence based upon the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p, which correspond with the Polaski decision and credibility determination, and listed all of the Polaski factors. The ALJ analyzed all of the evidence of record, and noted numerous inconsistencies in the record that detracted from plaintiff's subjective allegations of symptoms precluding all work. Review of the ALJ's credibility determination reveals no error.

The ALJ noted that the medical records were "replete with

-19-

documentation of non-compliance" on plaintiff's part regarding medical advice to stop smoking, despite the fact that plaintiff was advised, and had indicated his understanding, that he must stop smoking in order to improve his vascular status. (Tr. 23). The ALJ wrote that he considered it inconsistent "that an individual, if truly desirous of work, would repeatedly fail to comply with prescribed treatment for ailments which he feels are significantly limiting his functional capacity. It is reasonable to infer that an individual would attempt to comply with prescribed treatments which are intended to alleviate allegedly severe symptoms." (Tr. 23-24).

This finding is supported by the record. In the case at bar, plaintiff alleges that his vascular condition causes symptoms that render him unable to walk or perform any work. As the ALJ noted, plaintiff's medical records show that he failed to heed medical advice to stop smoking even though he knew that his thromboembolic events were related to smoking. The Commissioner's Regulations provide that a claimant must follow prescribed treatment if it can restore the ability to work, and further provide that failure to do so without good reason may result in a finding of not disabled. 20 C.F.R. §§ 404.1530, 416.930. The Eighth Circuit has held that failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application for benefits. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). In addition, subjective complaints of pain may be discredited when a claimant

refuses to heed his doctor's advice to stop smoking.  <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 1996).

Plaintiff argues that he had a good reason to ignore medical advice to stop smoking because he was unable to afford smoking cessation medication.  The Eighth Circuit has noted that, while evidence of financial hardship may justify a claimant's failure to obtain medication or remedial treatment, it is not an automatic excuse.  <u>Murphy v. Sullivan</u>, 953 F.2d 383, 386 (8th Cir. 1992) (citing <u>Tome v. Schweiker</u>, 724 F.2d 711, 714 (8th Cir. 1984)); <u>Johnson v. Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989); <u>Brown v. Heckler</u>, 767 F.2d 451, 453 n. 2 (8th Cir. 1985).  While plaintiff complains that Medicaid did not cover the expense of smoking cessation medication, the record fails to indicate that plaintiff sought other means of assistance to help him afford smoking cessation medication, or to afford other means of smoking cessation assistance.  In fact, when plaintiff was discharged from University Hospital on February 19, 2007, the importance of smoking cessation was again emphasized, and plaintiff was advised to talk to his doctor or to call "Fit For Life" (a telephone number was provided) if he needed help quitting or was interested in a smoking cessation program.  (Tr. 382).  Plaintiff does not argue, nor is there evidence in the record to support the conclusion, that he attempted to avail himself of this proposed assistance.  A claimant's assertions of a lack of financial resources are not convincing where he fails to take advantage of available medical assistance programs.  <u>See Brown v. Apfel</u>, 221 F.3d 1341 (8th Cir.

2000) (ALJ properly discounted claimant's contention that he could not afford medication and treatment absent evidence showing that claimant sought low-cost or free medical care, and given evidence suggesting that he routinely bought beer and cigarettes); see also Johnson, 866 F.2d at 275.

In addition, plaintiff did manage to afford to regularly buy cigarettes (and alcohol) to support what the record consistently documents was a regular consumption habit. At times relevant to the case at bar, plaintiff's habit totaled three packs of cigarettes (and a six-pack of beer) each day, and during the time directly preceding plaintiff's administrative hearing totaled one pack of cigarettes per day. While not alone dispositive, this is one factor supporting the ALJ's credibility determination. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (the fact that a claimant does not forego smoking to help finance medication detracts from his credibility).

Plaintiff also argues that his failure to stop smoking should be excused due to the addictive nature of tobacco. While plaintiff may be correct that smoking cessation is difficult, in the case at bar, the medical evidence repeatedly documents that plaintiff's smoking had a direct negative impact on his allegedly disabling thromboembolic events, and that plaintiff was well aware of such impact. Plaintiff's doctors repeatedly cautioned plaintiff that smoking increased his risks of developing more thromboembolic events, which plaintiff alleges cause symptoms that render him unable to walk or perform any work.

Similarly, plaintiff argues that it was improper for the ALJ to consider his failure to quit smoking because he had reduced his smoking to less than one pack of cigarettes per day. However, the contemporaneous evidence of record shows that plaintiff was smoking more than he admitted during the hearing. When plaintiff saw Dr. McDowell on August 19, 2008 and September 12, 2008 (immediately preceding his September 16, 2008 hearing), he reported that he was smoking one pack of cigarettes per day. (Tr. 663, 665). This is consistent with other evidence in the record as a whole, which shows that plaintiff told Dr. Freter that he was "not interested in quitting." (Tr. 370). Also, as noted above, plaintiff failed to forego purchasing cigarettes and alcohol in order to afford smoking cessation medication, and he also failed to avail himself of smoking cessation assistance when it was offered. Despite plaintiff's assertions that his failure to stop smoking should be excused, substantial evidence in the record as a whole supports the conclusion that plaintiff did not have a good reason to heed medical advice to stop smoking. The undersigned therefore concludes that the ALJ properly considered plaintiff's failure to follow medical advice to stop smoking. 20 C.F.R. §§ 404.1530, 416.930; <u>Kisling</u>, 105 F.3d at 1257; <u>Wheeler</u>, 224 F.3d at 895.

Continuing his analysis of the evidence of record, the ALJ noted that in March and April of 2008, plaintiff was noted to be enjoying an excellent recovery from surgery. Doppler ultrasound testing performed on plaintiff's lower extremities in June of 2008 revealed only mild findings on the right, and normal findings on

the left.  In August of 2008, plaintiff reported feeling good, with the exception of some discomfort in his right calf.  In September of 2008, Dr. McDowell noted that plaintiff's claudication appeared to be stable.  The lack of clinical findings is one factor an ALJ may consider in evaluating a claimant's subjective complaints of disabling symptoms.  Matthews v. Bowen, 879 F.2d 422, 425 (8th Cir. 1989).

When plaintiff saw Dr. Aggarwal on January 24, 2008, Dr. Aggarwal acknowledged that plaintiff's leg symptoms were unlikely to change following his aortic valve replacement surgery and, following that procedure, plaintiff was instructed to walk and climb stairs as tolerated, and to progressively increase his lifting from ten pounds during weeks one through four to 25 pounds during weeks five through 12.  In June of 2008, Dr. Wolf instructed plaintiff to walk for 30 minutes per day.  There is no evidence to support the conclusion that plaintiff's doctors felt that plaintiff should restrict his activities to the severe extent plaintiff testified that he did.  Similarly, while the medical evidence documents that plaintiff had some leg complaints, the evidence fails to show that plaintiff described to his doctors pain and functional limitations of the severe nature he described during the administrative hearing.  Plaintiff never reported to his doctors that he was unable to sit for long periods of time.  In addition, while plaintiff did occasionally report discomfort when walking, he did not describe limitations of the same severe nature he described during the administrative hearing.  The medical evidence shows that

-24-

Dr. Wolf advised plaintiff, just three months before the administrative hearing, to walk for 30 minutes per day. There is no indication in Dr. Wolf's office note that plaintiff made any attempt to express to Dr. Wolf that he was unable to do so. It appears that plaintiff's alleged limitations are due more to his own choice than any medical condition. See Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (ALJ properly discredited a claimant's testimony regarding self-limitation of physical activities when such limitations were inconsistent with the medical records); see also Schroeder v. Sullivan, 796 F.Supp. 1265, 1270 (W.D. Mo. 1992) (the claimant's need to take naps was not documented in the record, and his failure to complain to his doctors about drowsiness contradicted his assertion that he needed to nap during the day). If plaintiff were in fact limited to the alarming extent he alleges, it is reasonable to expect that he would report such limitations when seeking medical treatment.

While plaintiff testified that he was unable to lift more than ten pounds, the medical evidence shows that, following plaintiff's aortic valve replacement surgery, his doctors progressively increased his functional capacity from lifting ten pounds in weeks one through four to lifting 25 pounds in weeks five through 12. While plaintiff testified that he was unable to stand in one place or sit for longer than ten minutes and had to spend nine hours per day in a recliner, he indicated in his Function Report that he shopped for groceries and household supplies on a weekly basis for one hour, drove, went out alone, went outside

-25-

often, traveled to visit friends, and entertained friends in his home, some of whom visited every day.  The ALJ also noted that the evidence showed that plaintiff was involved in an altercation in July of 2007 and suffered injuries requiring medical treatment, and was fully ambulatory when released into the custody of the sheriff.  These inconsistencies detract from the credibility of plaintiff's subjective allegations of symptoms precluding all work.  "Where there are inconsistencies in the evidence as a whole, the [Commissioner] may discount subjective complaints."  Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir. 1995) (per curiam).

The ALJ also noted that plaintiff's work history, while fairly consistent, did not compel a favorable credibility determination when considered in light of the other evidence of record detracting from plaintiff's credibility.  Contrary to plaintiff's assertions, the ALJ did not consider plaintiff's history of relatively low earnings as detracting from his credibility; he merely mentioned plaintiff's earnings history in the context of acknowledging plaintiff's consistent work history.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  When an ALJ seriously considers, but for good reasons

-26-

explicitly discredits, a claimant's subjective allegations of symptoms precluding all work, that decision should not be disturbed. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Because the ALJ considered the Polaski factors and gave good reasons for discrediting plaintiff's subjective complaints of disabling symptoms, that decision should be upheld. Hogan, 239 F.3d at 962.

    B.   RFC Determination

    The ALJ in this case determined that plaintiff retained the RFC to perform the full range of sedentary work.  Plaintiff challenges the opinion of Dr. Stoecker, and claims that the ALJ committed various errors in determining his RFC.  Specifically, plaintiff argues that the RFC determination is not supported by some medical evidence, and that the ALJ failed to ensure a fully and fairly developed record and failed to identify plaintiff's functional limitations/restrictions on a function-by-function basis.  Review of the ALJ's RFC determination reveals that is supported by substantial evidence on the record as a whole.

    Residual functional capacity is defined as the most a person remains able to do despite his limitations.  20 C.F.R. §§ 404.1545, 416.945; Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all of the relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421

-27-

F.3d at 793.  Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.  Lauer, 245 F.3d at 704; see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).

In the case at bar, in determining plaintiff's RFC, the ALJ analyzed all of the medical and non-medical evidence of record.[7]  The ALJ noted that, following plaintiff's aortic valve replacement in February of 2008, his doctors opined that he should observe temporary restrictions in terms of pushing, pulling or lifting that might put strain on his chest, and could therefore lift only ten pounds during the four weeks following surgery, and 25 pounds during the fifth through 12th week following surgery.  The ALJ also noted plaintiff's testimony that he could lift 10 pounds.  The ALJ noted that no physician ever found or imposed any long term, significant and adverse limitations upon plaintiff's ability to function.  The ALJ also noted that, shortly before the administrative hearing, Dr. Wolf advised plaintiff engage in regular exercise in the form of walking for 30 minutes per day.

The ALJ in this case explained that he placed great weight upon the medical information from plaintiff's treating physicians.  The ALJ wrote that he rejected the assessment completed by the "non-physician adjudicator." (Tr. 25).  The ALJ was apparently referring to the "Explanation of Determination"

---

[7]The ALJ's treatment of Dr. Stoecker's opinion will be addressed, infra.

signed by a state agency disability examiner on October 10, 2007. The ALJ correctly noted that this was not medical evidence, and gave it no weight.

Plaintiff challenges the October 9, 2007 opinion of Dr. Stoecker, arguing that it is not contemporaneous with the ALJ's decision and that it fails to take into account subsequent medical information. However, nothing in the record indicates that Dr. Stoecker's opinion played any role in the ALJ's decision-making process. In fact, as the Commissioner notes, the ALJ mistakenly wrote that "[n]o state agency physician has rendered a decision in this case" (Tr. 25), and the ALJ's decision includes no acknowledgment or discussion of Dr. Stoecker's opinion. Review of the record alleviates concern that the ALJ was remiss or overlooked Dr. Stoecker's opinion. At the outset of the administrative hearing, the ALJ invited plaintiff's counsel to voice objections to the evidence. While counsel stated that he had no objections, counsel did voice concerns about Dr. Stoecker's opinion; namely, that subsequent medical records belied Dr. Stoecker's observation that plaintiff's aortic valve condition required no intervention and that his claudication had resolved. The ALJ acknowledged counsel's observations, and stated "I'll take note of that and I'll consider that." (Tr. 31). The ALJ then admitted the entire file into evidence "with that notation." (Id.) While the ALJ did write that no state agency physician had rendered a decision in the case, given the ALJ's statements in the record that he had noted counsel's concerns suggests not that the ALJ overlooked Dr.

-29-

Stoecker's opinion, but that he removed it from consideration.  Any deficiencies in Dr. Stoecker's opinion are not attributable to the ALJ.

Plaintiff contends that the ALJ's RFC determination is not supported by some medical evidence addressing plaintiff's functional abilities, inasmuch as there is no medical source statement from any of plaintiff's treating physicians.  However, the fact that no treating source submitted a medical source statement does not demand the conclusion that there is no medical evidence to support the ALJ's decision.  "An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Anderson, 51 F.3d at 779).  Medical opinions are but one type of medical evidence used to evaluate a disability claim.  Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (internal citations omitted) (in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively); Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree.").  In addition to medical records, the ALJ must also consider the observations of treating physicians and others, and the claimant's own description of his limitations.  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  Ultimately, RFC is an administrative determination reserved for the Commissioner.  Cox,

-30-

495 F.3d at 620 (citing 20 C.F.R. §§ 416.927(e)(2); 416.946 (2006)).

Plaintiff also contends that the ALJ failed to fulfill his duty to ensure a fully and fairly developed record, and should

The ALJ in this case considered all of the foregoing factors in determining plaintiff's RFC.  The ALJ considered medical evidence showing that, in February of 2008, plaintiff's treating physicians advised him to incrementally increase his functioning.  The ALJ also noted that, in June of 2008, shortly before plaintiff's administrative hearing, Dr. Wolf advised plaintiff to engage in additional exercise in the form of daily walks.  In September of 2008, Dr. McDowell noted that plaintiff's claudication appeared to be stable.  Plaintiff himself testified that he could lift ten pounds, and also testified that he had been gaining weight lately "[e]ver since [he] got to feeling a little bit better." (Tr. 34).  When considered with all of the other factors relevant to RFC determination, this constitutes some medical evidence supporting the ALJ's RFC assessment.  As the ALJ noted, the medical evidence plaintiff submitted in support of his claims failed to document that plaintiff's conditions imposed functional limitations beyond those specified in plaintiff's RFC.  The Eighth Circuit has recently recognized that this Court's role is to "review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations[.] . . . [W]e do not require an ALJ to mechanically list and reject every possible limitation.  McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011).

Plaintiff also contends that the ALJ failed to fulfill his duty to ensure a fully and fairly developed record, and should

have ordered a consultative evaluation to assist him in analyzing the voluminous and complex medical evidence of record.  Plaintiff contends that the ALJ's analysis of the evidence without the benefit of a consultative evaluation amounted to improper conjecture.  The undersigned disagrees.

It is well settled that an ALJ is required to ensure a fully and fairly developed record.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)).  Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.  Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004).  In considering plaintiff's argument, this Court's inquiry is whether plaintiff was prejudiced or treated unfairly by how the ALJ did or did not develop the record.  Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988)).  Absent unfairness or prejudice, remand is not warranted.  Id.

In the case at bar, there is no indication that the ALJ felt unable to make the assessment he made.  The ALJ thoroughly analyzed all of the medical and non-medical evidence of record, and in his RFC assessment recognized that plaintiff's conditions impose significant limitations, inasmuch as he limited plaintiff to sedentary work.  "'Sedentary work' represents a significantly restricted range of work, and individuals with a maximum sustained

work capacity limited to sedentary work have very serious functional limitations." 20 C.F.R. Pt. 404, subpt. P, app. 2 § 201.00(h)(4). Plaintiff presents no evidence from any of his physicians that he was limited to an extent greater than that determined by the ALJ. The ALJ also noted the results of objective testing, and the statements from plaintiff's treating physicians regarding how plaintiff should incrementally increase his functioning and walk daily for additional exercise. An ALJ's duty to develop the record is not never-ending, and an ALJ is not required to disprove every possible impairment. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). Plaintiff also fails to recognize that the ALJ was required to include in his RFC assessment only those limitations that he determined were credible and supported by substantial evidence in the record as a whole. See Tindell, 444 F.3d at 1007.

In addition, it is notable that counsel for plaintiff does not contend, nor does the administrative record indicate, that counsel raised any concern at the administrative level about the need to obtain a consultative evaluation or additional information from plaintiff's physicians. There is no indication that counsel ever raised this issue with the ALJ either before or during the administrative hearing, nor is it apparent that counsel himself made any attempts to obtain such information. While the ALJ has a duty to develop the record fully and fairly, even when a claimant is represented by counsel, "it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the

-33-

items that are now being complained about." Onstad, 999 F.2d at 1234.

The available evidence of record provided an adequate basis for the ALJ to determine the merits of plaintiff's claims, and the ALJ was therefore not required to order a consultative examination. See McCoy, 648 F.3d at 612 (citing Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986) (an ALJ is required to order medical examinations and tests only if the medical records presented are insufficient to determine whether the claimant is disabled). Plaintiff was treated fairly and has failed to demonstrate that he was prejudiced. The undersigned therefore concludes that the ALJ fulfilled his duty to ensure a fully and fairly developed record, and remand is unnecessary. See Onstad, 999 F.2d at 1234 (internal citations omitted).

Plaintiff also contends that the ALJ failed to assess his work-related abilities on a function by function basis, and failed to make findings regarding plaintiff's crush injury and subsequent finger amputation, his left arm blood clot, his left leg blood clot, poor circulation in his right leg, and environmental limitations related to his aortic valve replacement. Review of the ALJ's decision reveals no error.

Plaintiff is correct that the ALJ should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including functions such as sitting, standing, and walking.

-34-

Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) (quoting
S.S.R. 96-8p, 1996 WL 374184, at *1).  In Depover, the Eighth
Circuit noted that an ALJ's failure to make the function by
function assessment "could result in the adjudicator overlooking
some of an individual's limitations or restrictions."  Id.  The
Depover Court noted that, in Pfitzner v. Apfel, 169 F.3d 566, 568-
69 (8th Cir. 1999), the ALJ's decision was reversed on this basis
because the ALJ had failed to "specify the details" of the
claimant's RFC, and instead described it "only in general terms,"
leaving it unclear whether substantial evidence supported the ALJ's
decision that the claimant could return to his past relevant work.
Id.

       In the case at bar, however, (as in Depover) the ALJ did
not merely describe plaintiff's RFC in "general terms."  See Id.
Instead, as noted above, the ALJ conducted a detailed analysis of
the evidence of record and of plaintiff's testimony, and formulated
a specific RFC that took into account all of plaintiff's
limitations that the ALJ found credible and supported by the
record.  The ALJ also specifically wrote that plaintiff was able to
lift and carry up to ten pounds and sit for most of the day through
an eight-hour work day.  The ALJ also noted medical evidence
concerning plaintiff's functional abilities and advice to exercise,
which adequately takes into account plaintiff's lower extremity
conditions.

       Plaintiff complains that the ALJ erroneously failed to

include limitations related to his finger amputation and arm
condition, and environmental limitations related to his aortic
valve replacement. However, the record is void of evidence that
these conditions caused any functional limitations or necessitated
any environmental limitations, and plaintiff did not testify that
any of these conditions caused any functional limitations or that
he had any environmental sensitivity. While plaintiff testified
that he had some sensitivity in his finger amputation area when
placing his hand in his pocket or rubbing against something, he
described no difficulties in fingering or manipulating objects.
Plaintiff denied any problems with his left arm, and denied chest
pain or shortness of breath. None of plaintiff's doctors
identified any functional or environmental restrictions
attributable to any of the conditions plaintiff complains were
omitted, and plaintiff points to no evidence suggesting otherwise.
In fact, following his amputation revision procedure, plaintiff was
released to return to work without restrictions.

Having carefully reviewed the record, it is apparent that
the ALJ's RFC determination was made following a comprehensive
examination of the record, and it does not appear that the ALJ
overlooked any limitations. While the ALJ did not present his RFC
findings in bullet-point format with each limitation immediately
followed by a discussion of the supporting evidence, such a rigid
format is not required by Social Security Ruling 96-8p. The ALJ
thoroughly analyzed all of the medical and non-medical evidence,
performed a legally sufficient analysis of the credibility of

-36-

plaintiff's subjective allegations, and then formulated a specific RFC that took into account all of plaintiff's limitations caused by his medically determinable impairments that the ALJ found to be credible and supported by the record.  See Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (medical records, physician observations, and plaintiff's subjective statements may be used to support the RFC).  Because some medical evidence supports the ALJ's RFC determination, it must stand.  See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

The standard of review this Court must use in analyzing this case is a deferential one.  See Steed, 524 F.3d at 876.  The ALJ was able to observe plaintiff as he testified during the administrative hearing, and this, in addition to the voluminous medical evidence, convinced the ALJ that plaintiff was not entirely credible and could perform sedentary work.  The ALJ is in the best position to make this determination.  Id. (citing Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)).  The undersigned cannot say that the ALJ overlooked any of plaintiff's limitations. See Owen, 551 F.3d at 801-02 (No error in ALJ's failure to include an alleged impairment in RFC when evidence did not support the claimant's descriptions of restrictions allegedly caused by the impairment).  Because substantial evidence supports the Commissioner's decision, this Court may not reverse that decision merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001);

-37-

<u>Browning</u>, 958 F.2d at 821.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the Commissioner's decision is affirmed, and plaintiff's Complaint is dismissed with prejudice.


_Frederick R. Buckles_

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 26th day of December, 2012.